UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KAREN KEELER,
   PLAINTIFF

VS.

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,
   DEFENDANT

CASE NO. 1:05CV606
(DLOTT, J.)
(HOGAN, M.J.)

## REPORT AND RECOMMENDATION

Plaintiff filed her application for Social Security Income benefits in November, 2001. Her application was denied, both initially and upon reconsideration. Plaintiff then requested and obtained a hearing before an Administrative Law Judge (ALJ) in August, 2003. Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE), Janet Chapman. Following an unsuccessful decision in October, 2003, Plaintiff sought review by the Appeals Council, which was granted and the case was remanded to the ALJ. A second hearing before the same ALJ occurred in February, 2005. Plaintiff was again represented by the same counsel and testified. This time, the ALJ also heard from Dr. Terry Schwartz, a medical expert, and William Cody, a VE. Following a second unsuccessful decision, Plaintiff again sought review by the Appeal Council, and in August, 2005, the Appeals Council denied review. Plaintiff then sought judicial review by timely filing her Complaint with this Court.

## STATEMENTS OF ERROR

Plaintiff assigns three errors which she asserts affected the final decision in her case in a prejudicial manner. The first is that "The ALJ committed reversible error when she inverted the treating physician rule and announced that treating physicians had less, not more, credibility than Social Security consultants." The second is that "The ALJ's selective review of the facts in this case ignores the substantial evidence supporting a finding of disability." The third is that "The

ALJ's decision to disregard claimant's treating physician, Dr. Branson, and the limitations that doctor placed on claimant is not supported by the evidence."

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she was a single person, right-handed, 43 years of age, 5'6" tall and weighed 194 lbs. She further testified that she was a licensed driver, a high school graduate, and the former holder of a cosmetology license, although it has expired. She lives with her mother and brother on Loon Ave. in Cincinnati and was a former Bengals (Ben-Gal) cheerleader. Plaintiff's most recent employment was delivering dental appliances to prisons. She performed that work for approximately four or five months. Her health problems include degenerative joint disease of the left elbow, depression, fibromyalgia and multiple personality disorder. Plaintiff claimed to have been diagnosed at age seven with minimal brain damage resulting from birth trauma. She also told about counseling sessions as a teenager for migraine headaches, difficulty coping with stress and the onset of a rash affecting her hands.

Plaintiff testified that her chiropractor, Dr. McDowell referred her to a mental health therapist, Dr. Mankin for possible post-traumatic stress reactions observed during chiropractic treatment. Plaintiff told of a prior diagnosis of fibromyalgia and problems with her left elbow. She rated her physical problems as worse than her mental difficulties. Plaintiff testified that she obtained a GED despite "multiple fibroid tumors, fatty enlarged liver, a hiatal hernia, high blood pressure and a mildly enlarged uterus." She claims that a slip and fall accident halted her plans to continue her education at Scarlet Oaks or at the Raymond Walters branch, although she eventually attended Wilmington College, the University of Cincinnati and George Washington University.

Plaintiff estimated that she could sit for ½ to one hour, stand or walk for 15 minutes. She sees Dr. Marsha Bramson, her primary care physician, but saw no specialists at the time of her first hearing in August, 2003. However, after her first hearing, she began to see Craig Mankin, a therapist, and Dr. Casuto, a psychiatrist, who monitors her medication She takes Lexapro, Trazodone, an anti-depressant, Neurontin for fibromyalgia and some type of cream for a stress-induced rash on her hands. She spoke of allergic reactions to environmental agents, such as

cigarettes and chemicals. She experiences headaches at the rate of twice per month, the duration of which is approximately one week and experiences difficulty remembering things. She spoke of the need for a "job coach" to remind her of dates, times and procedures and to keep her "on task." Plaintiff testified that she occasionally quilts, watches television and reads. She is able to enter her quilts in various exhibitions and sometimes spends "up to 12 hours a day getting exhibits ready." She is able to work out on a treadmill three times per week for 15 minutes per session. Plaintiff testified during her second hearing in February, 2005 that she was no longer able to quilt or read, but had taken up crafts.

When questioned by her attorney about the diagnosis of multiple personalities and the shifting from one to another, Plaintiff emphasized that she finds it disturbing when "people interject or interrupt the pattern or the flow that I'm in." She referred to the process of shifting from one personality to another as "dissociating" and said that she experiences certain cues which indicate that the process is about to begin. (Tr., Pgs. 42-106)

## THE MEDICAL EXPERT

Dr. Schwartz, a clinical psychologist, expressed the opinion that Plaintiff was neither illiterate nor a person of borderline intelligence. Dr. Schwartz testified that Plaintiff's medical record supported the diagnoses of post-traumatic stress and personality disorders, but that her deficits did not meet any Listing. In the category called "Activities of Daily Living," Dr. Schwartz opined that Plaintiff could take care of her personal hygiene and maintain her hobbies and interests "to varying degrees at different times." In the category of "Social Functioning," Dr. Schwartz said that in his opinion, Plaintiff did not have a marked impairment of social functioning. Dr. Schwartz stated his opinion that Plaintiff did not exhibit marked deficiencies in her ability to concentrate and attend. When questioned about Plaintiff's deficiencies or restrictions, Dr. Schwartz warned against assigning Plaintiff to either a highly stressful or complex job. He felt that she could deal adequately with the public and could "probably handle a variety of work-related tasks."

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

In the first hypothetical, the ALJ asked the VE to assume the accuracy of Exhibits B4F and B5F, mental assessments made by psychologists, Bruce Goldsmith, Ph.D. and Bonnie Katz, Ph.D. and Exhibit B4F, the physical assessment made by Mary Johnson, M.D. The VE responded that Plaintiff would have the residual functional capacity to perform unskilled work as a cleaner at the light and sedentary exertional levels.

The second hypothetical asked the VE to assume the accuracy of Exhibit B14F, the mental assessment of Dr. Eggerman and Exhibit B4F, the physical assessment made by Dr. Johnson. The VE responded that Plaintiff could perform the jobs previously discussed.

The third hypothetical asked the VE to assume the accuracy of Exhibit B4F, the physical assessment made by Dr. Johnson and the following limitations: (1) Plaintiff has the capacity to understand, remember and carry out one or two steps without difficulty, (2) She can relate to coworkers and supervisors on a superficial and occasional basis, (3) She has the ability to make simple decisions and deal with occasional changes of routine, (4) She should be limited to a calm, consistent setting with low production demands. The VE indicated no change in the jobs previously described.

The fourth hypothetical asked the VE to assume the accuracy of Exhibit B4F, the physical assessment of Dr. Johnson, and the testimony of the Medical Expert, Dr. Schwartz. The VE testified that Plaintiff could perform the jobs previously described.

The fifth, and now a record-breaking number of hypothetical questions, asked the VE to assume the accuracy of Exhibit 6F, Dr. Bramson's assessment, and Exhibit 11F, which is Therapist Mankin's assessment. The VE responded that Plaintiff could not sustain employment.

The sixth hypothetical asked the VE to assume the accuracy of Exhibit B, the opinion of Dr. Casuto, Plaintiff's psychiatrist. The VE responded that if the described limitations listed therein were accurate, Plaintiff could not sustain employment.

The seventh, and thankfully last hypothetical, asked the VE to assume the accuracy of Plaintiff's testimony. To no one's surprise, the VE indicated that if Plaintiff were to be believed in total, she would be unemployable.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has severe impairments of depression, post-traumatic stress disorder, personality disorder, and fibromyalgia. The ALJ found that Plaintiff's impairments did not equal any Listing, and that she had the residual functional capacity to lift, carry, push and pull 20 lbs. occasionally and 10 lbs. frequently. According tot he ALJ's RFC findings, plaintiff can stand, walk and sit as needed during a workday. She has slight difficulties understanding, remembering and carrying out short and simple instructions. She has moderate difficulties understanding, remembering and carrying out detailed instructions. She has slight difficulties making judgments on simple work-related decisions. She has moderate difficulties interacting appropriately with co-workers, supervisors and the general public. She had moderate difficulties responding appropriately to work pressures in a usual work setting. She has slight difficulties responding to changes in a routine work setting.

Because the ALJ determined that Plaintiff could perform the light and unskilled jobs of cleaner, kitchen worker, and laborer as well as a representative number of sedentary and unskilled jobs, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act.

## THE MEDICAL RECORD

Dr. Bramson, Plaintiff's primary care physician, whose specialty is internal medicine, reported in December, 2001 that Plaintiff had complained of joint and/or spine pain since 1997 and that she suffered from chronic depression and fibromyalgia. Dr. Bramson felt that Plaintiff's ability to care for her personal needs and her ability to relate to others remained "intact." She treated Plaintiff with prescribed medications, including Effexor and Neurontin. (Tr., Pgs. 266-269) X-rays of the lumbar spine were taken in October, 1997 at Jewish Hospital and demonstrated "severe articular facet arthropathy." (Tr., Pg. 270).

Plaintiff was evaluated in December, 2001 by Paul Deardorff, Ph.D., a clinical psychologist. Dr. Deardorff both engaged Plaintiff in verbal communication, administered a number of psychological tests, including an IQ test, which resulted in a full-scale IQ of 75, and observed her in a clinical setting. Dr. Deardorff diagnosed Plaintiff with Dythymic Disorder,

5

Post Traumatic Stress Disorder, Reading Disorder and Mixed Personality Disorder. He assigned a GAF score of 58, which indicates moderate symptomatology. Dr. Deardorff found "moderate" impairment of Plaintiff's ability to relate to others, understand, remember and follow instructions, maintain attention, concentration and pace and withstand stress. (Tr., Pgs. 288-293).

Bruce Goldsmith, Ph.D. and Bonnie Katz, Ph.D., also clinical psychologists, evaluated Plaintiff in February, 2002. Drs. Goldsmith and Katz generally agreed with Dr. Deardorff's diagnosis and they also agreed that Plaintiff had "moderate" restrictions of her ability to maintain social function and maintain concentration, persistence or pace. Drs. Goldsmith and Katz felt that Plaintiff had a moderate limitation of her ability to understand and remember detailed instructions, but no limitation of her ability to understand and remember simple instructions. Drs. Goldsmith and Katz did not specifically address Plaintiff's possible limitations with regard to stress tolerance, but they did find that she displayed symptoms of depression and anxiety and recommended that she be placed in a work setting they described as "calm and consistent with low production demands." (Tr., Pgs. 295-310).

Mary Johnson, M.D., examined Plaintiff in March, 2002. Plaintiff reported diffuse bodily pain, which Dr. Johnson referred to as "somatic." Dr. Johnson felt that Plaintiff's depression "contributes significantly to her somatic complaints." Examination of her joints and the neurologic examination were normal, although there was decreased range of motion in the lumbar spine. Dr. Johnson diagnosed Plaintiff with myofascial pain syndrome, depression and facet arthropathy of the lumbar spine and felt she could physically perform "sedentary, light and moderate work-related duties." (Tr., Pgs. 311-314). X-rays taken by Eli Rubenstein, M.D. in March, 2002 showed a "normal lumbar spine." (Tr., Pg. 319).

In October, 2002, Dr. Bramson completed a document called "Medical Findings," upon which she indicated her residual functional capacity assessment of Plaintiff. Dr. Bramson indicated that Plaintiff could stand/walk for 2 hours, sit for 2 hours, lift 10 lbs and further indicated that Plaintiff should alternate positions every hour. Dr. Bramson was asked to state the period of time for which Plaintiff would have the stamina to work. Her answer is difficult to read, but appears (not only from observation, but when compared to Dr. Bramson's notes which appear in other placed in Plaintiff's medical record) to be 2 hours per day. (Tr., Pgs. 321-322).

From April to July, 2003, Plaintiff was treated on more than 30 occasions by Dr. McDowell at the Blue Ash Chiropractic Clinic. (Tr., Pgs. 332-352). Dr. McDowell referred Plaintiff to David Greenfield, M.D., an orthopaedic surgeon with the Freiberg group for left elbow pain after a fall. Dr. Greenfield diagnosed Plaintiff with "post traumatic stiffness of the left elbow with a pre-existing early degenerative arthritis. He recommended a program of physical therapy, which failed to alleviate Plaintiff's lack of 30 degrees of extension in the joint. Dr. Greenfield's modified treatment plan included the use of an extension brace to be worn at night and the continuation of chiropractic treatment, which took place between October, 2002 to August, 2003. (Tr, Pgs. 355-379).

Craig Mankin, the Family Service counselor who conducted therapy sessions with Plaintiff, diagnosed her with Dysthymic Disorder, Post-Traumatic Stress Disorder and Dissociative Disorder. He rated as "marked" Plaintiff's limitation regarding her ability to understand, remember and carry out detailed, but not complex job instructions as well as complex job instructions and her ability to work in coordination with or in proximity to co-workers without distracting or being distracted by them. Mr. Mankin also found that Plaintiff had "marked" limitations of her ability to accept instructions and criticism from supervisors, behave in an emotionally stable manner, relate predictably in social situations and respond appropriately to changes in the work setting. Mr. Mankin also found that Plaintiff had a "marked" limitation of her ability to maintain social functioning and to concentrate and persist. He felt that she had a "marked" limitation of her ability to be able to deal with, on a sustained basis, the stress of getting to work regularly, having performance supervised and remaining in the work place for a full day. He opined that Plaintiff would frequently decompensate, although for short periods of time. (Tr., Pgs. 381-385).

Mr. Mankin reported in September, 2003 that he had seen Plaintiff 46 times over the course of approximately one year, that an assault by a prominent figure in 1984 was the triggering event for Plaintiff's post-traumatic stress problem and that the cause of her dissociative problem was sexual, physical and emotional abuse by her father during her growth years. The therapist indicated that he had observed what he called "switching" to an alter personae on many occasions and believed the triggering mechanism was feelings of anger, frustration and fear.

7

(Tr., Pgs. 387-409). Treatment consisted of traditional psychotherapy sessions and medication provided by supervising psychiatrist, Leah Casuto, M.D. One of Plaintiff's personalities is "Carlita," the "free and wild side of her personality." (Tr., Pg. 488). Among Plaintiff's symptoms are "flashbacks, dissociative (switching) behavior, discomfort with crowds and strangers, difficulty trusting others and a strong startle response." Testing demonstrated an "extreme" level of nervousness or shakiness inside." (Tr., Pg. 489). Mr. Mankin produced a summary of each of his 80 sessions with Plaintiff from October, 2002 to June, 2004. In January, 2004, Dr. Casuto, a psychiatrist, prescribed Seroquel, an anti-psychotic medication which helps restore balance to persons with manic stages. (Tr., Pgs. 500-512)

A psychiatric examination was done by Kevin Eggerman, M.D. in August, 2004. Dr. Eggerman diagnosed Plaintiff with a Mood Disorder as well as a Personality Disorder. He assigned a GAF of 55. Dr. Eggerman's opinion was that "psychological factors are judged to play a role in the claimant's focus on her somatic complaints." Dr. Eggerman found "mild" restrictions of Plaintiff's ability to understand, remember and carry out simple instructions, make judgments and respond to changes in a routine work setting. Dr. Eggerman found "mild to moderate" limitations of Plaintiff's ability to understand, remember and carry out detailed instructions and to interact appropriately with the public, supervisors and co-workers. Dr. Eggerman found "moderate" limitations of Plaintiff's ability to respond appropriately to work pressures. (Tr., Pgs. 513-521).

Lastly, there is the opinion of Leah Casuto, M.D., the staff psychiatrist at Family Service. Dr. Casuto's diagnosis was Bipolar Disorder, Post-Traumatic Stress Disorder and Dissociative Disorder. Dr. Casuto rated as "less than moderate" Plaintiff's ability to follow work rules and adhere to basic standards of neatness and cleanliness. She rated as "moderate" Plaintiff's ability to maintain regular attendance and punctuality, interact appropriately with the public and be aware of normal hazzards. She rated as "marked" Plaintiff's inability to accept instructions and criticism from supervisors, make simple work-related decisions, respond appropriately to changes in the work setting and perform the activities of daily living. Dr. Casuto rated as "extreme" Plaintiff's inability to behave in an emotionally stable manner, maintain social function, concentrate and attend, and deal with workplace stress. She felt that there would be

episodes of decompensation, each of extended duration. (Tr., Pgs. 529-532).

## OPINION

In her first Statement of Error, Plaintiff is critical of the ALJ for misstating what has become known as "the treating physician rule." which is expressed in CFR 404.1527(d)(1) and (2). Logic and human experience would be in accord with the "treating physician rule" that physicians who actually treat, rather than those who merely examine or worse, review paperwork submitted by others, are more likely to express an accurate assessment of their patient. One would expect, as the Social Security Administration has concluded, that this fact is especially true when the relationship between doctor and patient has endured the test of time. It is also true that some physicians have a holistic view and see, for example, the relationship between obtaining financial benefits and the betterment of the patient's total condition. This view can account for exaggerating or stretching the truth in order to assist the patient in obtaining benefits. A similar bias to please the Social Security Administration or similar state agency and therefore retain employment may exist to color the accuracy of publicly paid experts also. We venture to say that making judgments on these and similar issues is at the heart of what we judges routinely do. We do not read the ALJ's comments to indicate that she was either ignorant or insubordinate with reference to the "treating physician rule." We do read her comments to indicate that her conclusions in this case, based on the evidence in this case, required her to reject the opinions of treating physicians and to place more credence on the opinions of a consulting psychiatrist and the medical expert, Dr. Schwartz, a clinical psychologist. Rather than evaluate this argument in a vacuum, we prefer to resurrect it in the context of the "substantial evidence rule."

We do not find that Plaintiff's First Statement of Error has merit; however, the better argument exists in the context of Plaintiff's Second Statement of Error that substantial evidence supports the opinions of Dr. Casuto and Mr. Mankin, the therapist whom she supervised. The ALJ placed "great weight" upon the opinion of the medical expert, Dr. Schwartz, as well as the opinions of Dr. Eggerman and Dr. Johnson and "little weight" upon the opinions of Drs. Casuto Deardorff and Bramson as well as Mr. Mankin. We shall examine the various opinions in light of Plaintiff's physical and then her mental deficiencies.

9

The ALJ specifically found that Plaintiff has fibromyalgia and that it should be classified as "severe." She then questioned that finding by asserting that "The record does not really show that the claimant has the necessary 11 out of 18 trigger points to make the diagnosis of fibromyalgia." While we fail to understand the inconsistency, we do agree that there is little evidence of Plaintiff's physical problems and the little there is comes from Dr. Johnson, Dr. Bramson, Dr. McDowell, and Dr. Greenfield. Dr. Johnson's examination showed Plaintiff to have facet arthropathy of the lumbar spine and myofascial pain syndrome. Dr. Johnson's neurological examination was normal as was her examination of Plaintiff's joints. Dr. Johnson did find decreased range of motion in the lumbar spine. Dr. Bramson agreed with Dr. Johnson's opinion that Plaintiff had facet arthropathy of the lumbar spine. but categorized Plaintiff's back problem as "severe articular facet arthropathy" as a result of an x-ray taken in 1997 at Jewish Hospital. A x-ray taken by Dr. Rubenstein in 2002 showed a normal lumbar spine. Plaintiff had a number of chiropractic sessions with Dr. McDowell. She treated with Dr. Greenfield, but his treatment was for trauma to Plaintiff's left elbow, which was found to have degenerative arthritis. Dr. Johnson felt that Plaintiff had the residual functional capacity to perform the requirements of light work. Dr. Bramson, Plaintiff's treating primary care physician, expressed the opinion that Plaintiff could sustain work for only two hours per day.

The ALJ resolved the conflict by looking at the physical activities Plaintiff was able to do. Plaintiff's own testimony was that she worked out on a treadmill three times per week for 15 minutes. It is true that we have no information about either the elevation or speed and whether Plaintiff was walking or running while "working out on the treadmill." Plaintiff did say that on occasion, she was able to work on her quilt exhibitions for "up to 12 hours per day." She is able to drive, wash clothes and occasionally cook, participate in jazzercise and visit Kings Island.

The ALJ chose to give more credit to the physical findings of the examining, but non-treating physician, Dr. Johnson, who limited Plaintiff to the exertional requirements of light work. There is substantial evidence to support that finding and thus there is no prejudicial error in the ALJ's resolution of Plaintiff's ability to work based on her physical limitations.

The ALJ relied upon the mental restrictions provided by Dr. Eggerman, an examining but non-treating psychiatrist, who found that Plaintiff had a "moderate" limitation of her ability to

10

respond appropriately to work pressures and "mild to moderate" limitations of her ability to understand, remember and carry out detailed instructions and to interact appropriately with the public, supervisors and co-workers. Although Dr. Deardorff also rated Plaintiff's ability to relate to others as "moderately impaired," he differed only slightly in his evaluation of Plaintiff's ability to understand, remember and carry out instructions and relate to the public. Dr. Deardorff rated Plaintiff's limitations in the latter two categories as "moderate," rather than the mild to moderate limitations imposed by Dr. Eggerman. Neither found any marked or extreme limitations in any category of mental function and Dr. Schwartz, the medical expert and a clinical psychologist, agreed. Dr. Schwartz also expressed concern, as did Dr. Deardorff and to some extent, Dr. Eggerman, that Plaintiff not be put in a highly stressful or complex job. These three experts expressed opinions remarkably similar in our view.

      Mr. Mankin and Dr. Cusuto disagreed and both are treating sources. Dr. Casuto's function was to administer medication in order relieve Plaintiff's mental symptoms and to make the counseling sessions more effective. There is no evidence in Plaintiff's medical record that Plaintiff ever had psychotherapy sessions with Dr. Casuto, who prescribed Seroquel in January, 2004 and met with Dr. Casuto in February, 2004 for the purpose of deciding whether to fill the prescription for Seroquel. Dr. Casuto left blank a question on her residual functional capacity assessment requesting the history of treatment with dates, a fact which demonstrates her lack of personal contact with Plaintiff. Thus, it would appear that Dr. Casuto's opinion is very dependent upon the accuracy of treatment notes provided by Mr. Mankin, who holds a masters degree, and saw Plaintiff approximately 80 times over a two-year period.

      Mr. Mankin found marked limitations in 10 of the 20 functions listed, including all those functions which were listed by Drs. Eggerman and Deardorff as having moderate or mild restrictions. We must conclude that substantial evidence supports the much less restrictive view held by Drs. Deardorff, Eggerman and Schwartz. The GAF scores submitted by Dr. Deardorff and Dr. Eggerman were 58 and 55 respectively and these scores reflect moderate symptoms. In accord was the GAF score provided by Mr. Mankin in 2003. Although Drs. Goldsmith and Katz were paper reviewers, their assessment is in accord with that of Drs. Deardorff, Eggerman and Schwartz because none of these persons found any marked restriction relative to Plaintiff's

11

mental function.

We find that the ALJ made her assessment of the severity of Plaintiff's restrictions on the basis of the medical evidence of record and not on some perceived bias against treating sources. In doing so, she committed no error prejudicial to Plaintiff's case.

The third Statement of Error is that the ALJ's decision to disregard the opinion of Dr. Bramson is unsupported by the evidence. Again we disagree. Dr. Bramson's opinion is that Plaintiff suffers from fibromyalgia, a conclusion basically shared by Dr. Johnson, although the latter referred to it as "myofascial pain syndrome," probably because of the lack of specific trigger points. Dr. Bramson's treatment consisted of prescribing medication for fibromyalgia and depression. Dr. Johnson reported that Plaintiff experienced pain wherever touched, a reason for considering Plaintiff's subjective reports of pain as somewhat exaggerated. Dr. Johnson found no muscle atrophy nor reflex deficiencies and found that Plaintiff had normal joints. The ALJ accommodated Plaintiff's fibromyalgia and facet arthritis by precluding heavy or medium work in accordance with Dr. Johnson's residual functional capacity assessment. While Plaintiff may have been further restricted because of her left arm stiffness and inability to completely extend her left arm, she is right-handed and the jobs listed by the VE do not require full extension of the left and non-dominant arm.

## CONCLUSION

Since we find that none of Plaintiff's Statements of Error has merit and further find that the decision of the ALJ in this case is supported by substantial evidence, we recommend that said decision be affirmed.

March 7, 2008

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KAREN KEELER,
    PLAINTIFF

VS.

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,
    DEFENDANT

CASE NO. 1:05CV606
(DLOTT, J.)
(HOGAN, M.J.)

## NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 3-7-08. Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).